IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STEVEN JONES,
        Plaintiff,

vs.                                                 No. 18-1290-JTM

BLATTNER ENERGY, INC.,
    *and* SAUL HURTADO,
        Defendants.

MEMORANDUM AND ORDER

On August 29, 2018, plaintiff Steven Jones was injured in a motor vehicle accident with Saul Hurtado in Pratt County, Kansas. At the time, Jones on his motorcycle and Hurtado in his pickup truck were both driving to their places of employment. Jones has brought the present action for negligence against both Hurtado and his employer, Blattner Energy. Both Jones and Blattner have moved for summary judgment on the issue of whether Hurtado's employer is liable for Hurtado's actions under the doctrine of respondeat superior. The court holds that under long-standing Kansas law, the employer is not legally responsible for Hurtado's actions at the time of the accident.[1]

---

[1] Jones moves for partial summary judgment solely on the issue of vicarious liability. Blattner Energy moves for summary judgment on all claims advanced by the plaintiff, including direct liability for negligence hiring or supervision. As to the latter, Blatter argues that Jones cannot recover for negligent hiring or supervision given the circumstances of the accident. *See Schmidt v. HTG, Inc.*, 265 Kan. 372, 961 P.2d 677 (1998); *Wayman v. Accor N. Am.,* 45 Kan. App. 2d 526, 539, 251 P.3d 640, 649 (2011); *Kitzler v. Alenco, Inc.*, 2006 WL 3740852 (Kan.Ct.App. Dec. 15, 2006) ("Kansas case law establishes that a claim for negligent

**Findings of Fact**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the

retention against an employer must be based on actions that took place on the working premises, during the time employment services were normally rendered"). The plaintiff argues that because the court has previously limited discovery to vicarious liability issue, and it should not reach the issue, proposing to voluntarily dismiss the additional claims (Resp. at 2-3, 24-25). Blattner's Reply (Dkt. 44) does not directly address the issue. Consistent with the plaintiff's representation of voluntary dismissal, the court will, for now, grant the defendant's motion in part, dismissing the vicarious liability claim.

allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The court excludes from the following findings all assertions by the parties which are not fairly supported in the cited factual record.

Blattner Energy is in the business of constructing and maintaining wind turbines and was under contract to do work on a wind turbine installation project commonly referred to as "Pratt Wind."

Saul Hurtado is a New Mexico resident who has worked for Blattner as an installation laborer at various sites since 2017. Hurtado was temporarily renting a home in Pratt, Kansas while working on Pratt Wind. It is uncontroverted that Hurtado made his own living arrangements while working on Pratt Wind. Blattner Energy did not direct Hurtado on where to live, how to live, or who, if anyone, to live with.

Many of the workers on Pratt Wind, and all of the workers in Hurtado's workgroup, normally lived outside Kansas.

Hurtado's job duties involved the construction of wind turbines (or windmills). He was a tower climber and would climb an estimated 280 feet high on the towers to perform his work. Travel or performing errands or business transactions for Blattner Energy during non-work hours was not within Hurtado's job duties.[2]

Blattner paid Hurtado an hourly wage, and provided a per diem for each day he worked.[3] Blattner did not direct or control how Hurtado spent the per diem funds he received. Hurtado testified, "you could do whatever you want with that money."

Work at Pratt Wind commenced when employees arrived at what was know as the "Laydown Yard," which was located 10 to 12 miles outside of Pratt. The closest hotels were in Pratt.

Blattner required to employees to be at the job site by a specified time, but it did not control or direct travel to the job site. Typically, Hurtado's start time was 7:00 a.m. He would travel to the laydown yard to start work each morning, where he would attend a safety meeting and then travel into the field in a company-owned vehicle to work on erecting wind turbines. His compensation did not begin until he arrived at the laydown yard for the daily safety meeting. He received no separate compensation for the time spent travelling to and from work.

---

[2] The plaintiff denies this fact on the grounds that it is not supported by "any document providing an express list of job duties." (Dkt. 39, at 4). But the asserted fact is explicitly supported by the affidavit of Travis Hanson, the Pratt Wind Project Manager, and the evidence cited by the plaintiff does nothing to cast doubt on his explanation that travel or running errands was not a part of Hurtado's duties. The cited evidence simply shows that Blattner expected its employees to be at the job site on time.

[3] Workers who lived more than 65 miles away from the worksite, like Hurtado, were paid a $100 per diem.

The accident occurred around 6:30 a.m., before Hurtado arrived at the Blattner Energy laydown yard and before Hurtado began earning any wages. Hurtado was driving his own personal vehicle to work (actually owned or co-owned by or with his mother).

It was up to Hurtado to make his own travel arrangements to work. Blattner did not pay mileage reimbursement, fuel, maintenance, insurance, or other expenses associated with Hurtado's personal vehicle involved in the subject accident. Hurtado paid for all fuel, maintenance, and insurance. Blattner did not direct Hurtado on how to maintain or operate his personal vehicle.

Hurtado did not operate or drive a vehicle owned by Blattner, because he was not "driver qualified" by the company. At the time of the subject accident, Hurtado was not transporting any tools, equipment, or materials for Blattner, and had never done so for Blattner Energy. He had not been running any errands or performing any business transactions for Blattner; indeed, he had never done so on his way to work. Blattner Energy did not direct Hurtado to use a certain route to get to the laydown yard, did not tell him how to drive his vehicle, or instruct him to transport co-workers to the jobsite.

Hurtado and two co-workers (Joel Gonzalez and Guillermo Chaves) rented a residence in Pratt, and the three drove together to the Laydown Yard. Hurtado paid the driving expenses with his per diem allowance.

The evidence indicates that Blattner was aware that some employees shared rides, but it did not require it, or even do anything in particular to encourage it. The plaintiff

points to the Blattner employment application completed by Hurtado (like all employees), which indicates "we prefer applicants who are able to operate a vehicle to transport co-workers." But the evidence indicates this preference related to employees becoming "driver qualified" (which Hurtado was not) so they could use company vehicles to transport workers. As indicated earlier, at the time of the accident, Hurtado was not driving a company vehicle, he was not being paid for his travel, and he was not on working hours.

The last day Hurtado did any of his required duties for Blattner Energy was the day before the accident. Blattner did not pay Hurtado any wages on the date of the accident because he did not do any work for Blattner on that day.[4]

Beyond the scheduled start time, Blattner did not control Hurtado's movements. It never directed Hurtado as to what time he needed to wake up in the morning or what time he needed to leave his house in the morning in order to make it to work on time. It

---

[4] Jones contends that Hurtado received two per diem payments after the accident, on August 31 and September 7, 2018. The cited records, however, merely indicate that direct deposits (of $700 and $200, respectively) were made on those two dates. The records do not indicate when the underlying per diem was earned. Nothing in the record controverts Hurtado's explicit testimony:

 Q. And so you didn't get paid by Blattner for that day of the accident; is that true?

 A. That's true.

 Q. And does that also mean you didn't receive a per diem payment from Blattner for the day of the accident, correct?

 A. Correct.

is uncontroverted that between the time Hurtado left work on the day before the accident (August 28, 2018) and the time of the accident, Hurtado had not received any direction from Blattner giving him instruction on what he needed to do. He was not on-call for Blattner while he was off duty and was not directed by Blattner on what he needed to be doing during the time he was off duty.

The location of the job site effectively precluded Hurtado from commuting from New Mexico, and the distance of the site from Pratt inhibited, as a practical matter, workers from having lunch in Pratt over their break. Beyond these practical limitations, and from the end of work on one day and the start on the next, Hurtado was free to do what he wished.

Hurtado did not show up for work on the date of the accident, stating that he wanted a day off. The following day he called and "told them I'm just going to go ahead and go home," effective resigning his employment.[5]

Hurtado had never been written up for a safety violation or disciplinary action by Blattner.

---

[5] The plaintiff stresses that, after the accident a supervisor drove to the scene of the accident and drove the otherwise-stranded Gonzalez and Chaves to the work site. It is, however, hard to see how that is material. The fact remains that Hurtado's co-workers developed their own carpooling arrangement to the laydown yard on the Pratt Wind project, which Blattner did not direct and had no involvement in coordinating. Worker attendance is an integral part of the employment relationship, and the plaintiff has failed to point to any facts showing that Blattner controlled Hurtado's travel, or otherwise obtained some exceptional or unusual benefit from it.

Jones was commuting to his place of employment at the time of the accident, and despite being injured, he has not filed a workers compensation claim with his employer relative to the subject accident.

Hurtado does not believe Blattner Energy was controlling his activities the morning of the accident while he was driving to work.

**Conclusions of Law**

Here, recovery by the plaintiff is precluded by the "the widely-accepted rule that an employee is not acting within his or her scope of employment when driving his or her own vehicle to or from the workplace." *See Girard v. Trade Prof'ls*, 50 F.Supp.2d 1050, 1052 (D. Kan. 1999*), aff'd*, 13 F. App'x 865 (10th Cir. 2001). In *Girard*, the court recognized that the rule — known as the "going and coming" rule — was "recognized by almost every supreme court," and had long been the rule in Kansas as well. *Id*. (citing 27 A.L.R. 5th 233-38, and *Kyle v. Postal Telegraph–Cable*, 118 Kan. 300, 302, 235 P. 116 (1925)).

In *Girard*, the court stressed that the doctrine was consistent with the general standards of respondeat superior under Kansas law, because it directly related to the right to control the agent's actions:

> [Defendant] Trade Professionals had no control over Anders' actions once he clocked out for the day. As in *Kyle*, Anders could have traveled home by any route or he could have chosen not to go home at all. Anders was not on call and could not be ordered back to work until the next morning. The court also concludes that Anders was not engaged in the furtherance of Trade Professionals business by driving himself and a co-worker home at the end of the work day. To hold otherwise, would potentially subject every

8

> employer in Kansas to liability for its employee's negligence in driving to and from work, would directly contradict the doctrine of respondeat superior as applied in Kansas, and would undermine the sound public policy supporting the going and coming rule.

*Id.*

The plaintiff presents three arguments why the court should not follow the coming and going rule. First, he stresses that the *Girard* decision was rendered prior to the Tenth Circuit's decision in *O'Shea v. Welch*, 350 F.3d 1101, 1106 (10th Cir. 2003), and should be viewed as being limited by that decision. Second, Jones argues that the coming and going rule should be limited to workers compensation cases. Third, he argues that the rule should be discarded or considered inapplicable, in part because the cited cases involve employees who have left their jobs,

The court finds plaintiff's attempt to distinguish *Girard* and *Kyle* unpersuasive. As discussed more fully below, *O'Shea* did not address the going and coming rule, but instead addressed a separate issue – whether Kansas would adopt the "slight deviation" rule in the case of an employee who injures a third party. Nothing in that opinion suggests any reason for this court to abandon the coming and going rule adopted by the court in *Girard*. The court further notes that this court's decision in *Girard* was also explicitly affirmed by the Tenth Circuit in *Girard v. Trade Prof'ls*, 13 Fed.Appx. 865, 868-69 (10th Cir. 2001). In addition, the Kansas Court of Appeals has recently cited *Girard* as an authoritative statement of Kansas law:

> As a general rule, an employer is not liable under Kansas law for an employee's negligence while the employee is traveling to or from the job.

9

> That's known as the "coming and going" rule—and it makes sense because the employee isn't acting within the scope of employment while coming to or going away from the jobsite

*Ullery v. Othick*, 2017 WL 383718, at *5 (Kan. Ct. App. Sept. 1, 2017) (citing *Girard*, 50 F.Supp.2d at 1052). This decision, coming some 14 years after the Tenth Circuit's *O'Shea* decision, belies the suggestion that *O'Shea* somehow changed Kansas law.

Second, while it is true that the going and coming rule most frequently arises in the context of workers compensation cases, *see, e.g., Scott v. Hughes*, 294 Kan. 403, 413, 275 P.3d 890, 898–99 (2012), the doctrine is clearly not limited to actions under the statute. *Kyle* and *Girard* both applied the doctrine to independent third party tort claims, with *Girard* specifically concluding the Kansas Supreme Court would not limit the doctrine to actions under the Workers Compensation Act. Similarly, the Kansas Court of Appeals found the doctrine relevant (if, as discussed below, the doctrine was inapplicable on the facts) in a tort action for damages in *Mulvaney*.[6] *See also Ullery*, 2017 WL 3837218, at *5-6 (holding, in a wrongful death case, that "even if Joann *were* considered a Windsor Place employee," under the coming and going rule "Windsor Place would not have been responsible for her negligence while driving her car after the training session") (emphasis

---

[6] *See also O'Shea v. Welch*, 350 F.3d 1101, 1106 (10th Cir. 2003) (while the scope of employment in workers compensation cases and in vicarious liability cases "are not necessarily" the same, the caselaw from workers compensation cases "supports our analysis that Kansas has considered and adopted slight deviation analysis in at least one area of law").

in original). The doctrine in Kansas is not limited to cases under the state workers compensation act.

Finally, the plaintiff's suggested limitation—that rule should only apply to employees *leaving* work—does not bear scrutiny. This is, after all, the going *and coming* rule, and the plaintiff cites to no case suggesting there are different standards for going as opposed to coming.

The cases relied on by plaintiff, *O'Shea v. Welch*, 350 F.3d 1101 (10th Cir. 2003); *Certain Underwriters at Lloyd's v. FlightSafety Internat'l*, 2017 WL 1332674 (D. Kan. April 11, 2017); *Wayman v. Accor N. Am.*, 45 Kan.App.2d 526, 251 P.3d 640 (2011); and *Mulroy v. Olberding*, 29 Kan.App.2d 757, 30 P.3d 1050 (2001), do not support a different result. Each of the cases cited by plaintiff is plainly distinguishable.

In *O'Shea*, the going and coming rule is not even mentioned – for the unsurprising reason that the employee, an Osco manager, in that case had already reported for work. The court noted both that the manager's trip was business related ("driving [from his store] to deliver a vendor gift to the district office") and that such trips were a routine part of his employment ("Welch frequently made trips for Osco using his own vehicle"). 350 F.3d at 1103. These facts are absent from the present case. At the time of the accident, Hurtado had not arrived at the job site, was not at work, and (beyond his expected presence at the job site) his travel provided no direct benefit to the employer. The facts are squarely within the scope of the coming and going rule.

*FlightSafety* is even more distinguishable, as the case involved no motor vehicle accident at all. Rather, the case involved a hotel fire caused by an employee. The court denied the employer's motion to dismiss for multiple reasons. First, the court noted there were allegations of benefit to, and control by, the employer. The plaintiff alleged that the stay was in a long-term residence hotel with cooking facilities in the rooms, the employer selected and paid for the hotel, and during the stay the employee was or may have been on call. Second, the court repeatedly stressed that the defendant sought dismissal prior to discovery. There was thus no evidence about the employee's job duties, his working hours, the "specific requirement and/or nature of his employment," the length of his stay, or whether he was "still on-call." *Id.* at *1, *7. The court specifically noted that the defendant might ultimately be entitled to a determination the accident fell outside the scope of employment, but that "this determination should be made after a full opportunity to discover the facts surrounding the accident." *Id.*

Here, full discovery has occurred. Long-standing Kansas adherence to the coming and going rule supports the determination that Hurtado was not subject to Blattner's control at the time of the accident.

*Wayman* and *Mulroy* are even less supportive. In *Wayman,* the Kansas Court of Appeals upheld an award of summary judgment in favor of the employer, holding that an intoxicated motel general manager was not acting within the scope of his employment when he ran over a guest, even though the manager was on call at the time of the accident, and his employer required the manager to stay at the hotel as a condition of his

12

employment. 251 P.3d at 647. In *Mulroy*, the court found that the employer was legally responsible for the actions of its driver given evidence that the employer "had the right to control, and did control, [the driver employee] at the time of the accident." 30 P.3d at 1057. The court stressed that, in contrast to the driver's normal travel between his home and a primary job site, the employer did pay for his travel to other sites, which included the trip involved in the accident. Moreover, the employer had immediately terminated the driver's employment, with the notice stating that he was "discharged because he was under the influence of alcohol *during working hours*." *Id*. (emphasis added). This is, of course, diametrically opposite the present case. Here, the accident occurred before working hours, Hurtado was not separately paid for his travel, and the uncontroverted evidence is that Blattner Energy did not exercise any control over Hurtado's driving.

In contrast to the cases cited by the plaintiff, it is difficult to imagine case more on point than *Girard* itself. In that case, as in this, the plaintiff relied in part on the fact that the employee involved in the accident was in Kansas temporarily for his employment, and was receiving a general per diem allowance. These factors did not amount to a right to control over the employee such that the accident was within the scope of employment:

> [T]he court rejects plaintiff's arguments that Anders was a 24 hour-per-day employee because Trade Professionals sent him to an out-of-state job site and paid him a per diem to cover the added expenses of working away from home. It is undisputed that Anders was not directly reimbursed for his travel. The per diem was added to Anders' paycheck to defray his transportation costs, additional daily living expenses, meals, and hotel or lodging costs. Furthermore, the per diem was not contingent on a showing of incurred travel or transportation costs, and Anders was free to spend the extra income as he wished.

13

50 F.Supp.2d at 1053.

Here, Blattner did nothing to control Hurtado during the travel. It did not separately compensate him for his travel, and the accident did not occur during working hours. The defendant tolerated but did not require or affirmatively encourage ride sharing.[7] Hurtado drove his own vehicle and chose his route to work. The distance travelled, 10 to 12 miles, is not an extraordinary distance anywhere, and certainly not in Western Kansas. The defendant received no benefit from the travel, other than the subsequent attendance at work — a benefit and an expectation shared by all employers.

---

[7] We know from *Girard* that that the doctrine in Kansas is not defeated merely by informal ride sharing. *See* 50 F.Supp.2d at 1053 ("Anders was not engaged in the furtherance of Trade Professionals business by driving himself and a co-worker home at the end of the work day"). The rule in other jurisdictions is similar; the coming and going rule is not defeated by participation in voluntary carpooling. *See Anderson v. Pacific Gas & El*ec., 14 Cal.App.4th 254, 262, 17 Cal.Rptr. 534 (1993) ("[d]riving Quintana to and from work was not part of Henry's regular duties, nor was it done at the specific direction of [employer] PG & E. [but] an informal arrangement between themselves to drive one another to work on alternate days"); *Caldwell v. A.R.B., Inc.*, 176 Cal. App. 3d 1028, 1037, 222 Cal. Rptr. 494, 500 (Ct. App. 1986) (no exception to doctrine where employee's offering a ride to co-worker was "purely gratuitous," and "[n]othing in the facts suggests that A.R.B. ever requested or suggested that certain employees provide transportation for other employee"). A different result may occur if the employer mandates carpooling. *See Anderson v. Falcon Drilling*, 695 P.2d 521, 525-26 (Okla. 1985) (finding issue of fact as to scope of employment were evidence showed "the driver … was required by the driller, his immediate supervisor, to car pool," that the accident occurred "as a result of the car pooling arrangement" given the route involved).

IT IS ACCORDINGLY ORDERED this day of September, 2019, that plaintiff's Motion for Partial Summary Judgment (Dkt. 32) is denied; defendant's Motion for Summary Judgment (Dkt. 30) is granted in part as to plaintiff's vicarious liablity claim, and otherwise denied without prejudice.


s/ J. Thomas Marten
J. Thomas Marten, Judge